**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**EMLYN LOUIS,**

       **Plaintiff,**

**vs.**                             **Case No. 4:12cv48-MW/CAS**

**CORIZON HEALTH, INC.,**

       **Defendant.**

_____/


## REPORT AND RECOMMENDATION

       Defendant filed a motion for summary judgment, doc. 23, and Plaintiff, who is pro

se, was given an opportunity to file a response, doc. 25.  Plaintiff's response was timely

filed, doc. 26, and supplemented by the filing of an affidavit of Dr. Maurice Marholin.[1]

Doc. 33.

       Plaintiff initiated this case in state court and Defendant removed it to this Court in

early 2012.  Docs. 1, 3.  Plaintiff's complaint alleged claims under Title VII and

supplemental state law claims under Chapter 760, Florida Statutes.  Doc. 3-1.  The

state law claims were dismissed, docs. 21-22, and the motion for summary judgment is

---

[1] Defendant's motion to strike the original affidavit of Dr. Marholin, doc. 27, was
granted.  Doc. 29.

limited to the remaining Title VII claims for retaliation and racial discrimination.  Docs. 21, 22.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment, the Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id*.  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts.  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Industrial

Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano, 129 S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

## Rule 56 evidence

Plaintiff was employed by the Defendant [or "Corizon"] as Medical Director at the Leon County Correctional Facility [hereinafter "Facility"] from December 21, 2009, to December 20, 2010. Doc. 23 at 2; ex. C (doc. 23-3).[2] Plaintiff was interviewed for the

---

[2] All references to exhibits are to the exhibits submitted with Defendant's motion for summary judgment, doc. 23. Plaintiff submitted three exhibits (doc. 26, exhibits G, H and the Morghem Affidavit) in opposition to summary judgment, although Plaintiff's Ex. H cannot be reviewed as it has been stricken, *see* doc. 29, but is replaced by the "updated affidavit" of Maurice Marholin, doc. 33. However, the vast majority of the "facts" presented in Plaintiff's opposition contain no citation to the "source of the relied upon material fact." N.D. Fla. Loc. R. 56.1(A). Facts presented in Plaintiff's statement of facts which are not based on facts in the record and are not sworn statements, cannot be considered in opposition to summary judgment. *Id.* Furthermore, Plaintiff's opposition, doc. 26, is not properly signed and does not contain his original signature. Plaintiff is not authorized to sign and file documents electronically. N.D. Fla. Loc. R. 5.1(A)(5). It has gone unnoticed until now that Plaintiff has been improperly providing an electronic signature on all documents submitted rather than his original signature. *See* docs. 11, 17, 18, and 33. The documents should not have been filed. Nevertheless, Plaintiff's arguments have been considered, and any statements of fact

position of Medical Director by Dr. Scott Kennedy, Corizon's Regional Medical Director, and the Facility's Health Services Administrator, Colleen Meringolo. Exhibits C and D (docs. 23-3, 23-4). While employed by Corizon, Plaintiff was to report to Meringolo concerning administrative matters and to Dr. Kennedy for matters of professional medical judgment. Exhibits D and E (docs. 23-4, 23-5). Dr. Kennedy explained to Plaintiff "on more than one occasion that, although he reported to [Kennedy] regarding medical decisions, Ms. Meringolo, was the highest ranking manager for Corizon employees at the Facility." Ex. D at 2 (doc. 23-4). As such, Plaintiff "was required to report to Meringolo for all matters other than medical decisions." *Id.* Plaintiff "never respected Ms. Meringolo's authority," Ex. E at 2-3 (doc. 23-5), and Plaintiff admitted in his deposition that he never accepted Meringolo as his supervisor. Plaintiff's deposition, at 158, 159, 171 (doc. 23-1); Plaintiff's second deposition at 78 (doc. 23-2).

Plaintiff was required to work a certain number of hours each week and record his time through Corizon's "clock-in procedures to establish that Corizon was meeting its contractual obligations" with the Leon County Sheriff. Ex. C at 2 (doc. 23-3). All employees were required to abide by that requirement as well as other administrative and procedural protocols. *Id.* Plaintiff, however, "was extremely resistant to these protocols throughout his employment." Ex. E (doc. 23-5 at 2). It appeared to Meringolo that Plaintiff felt "that he was 'above' having to follow the rules and company required procedures." Ex. C (doc. 23-3). In meetings and conference calls concerning company procedures and rules, Plaintiff appeared "to 'tune out,' choosing instead to direct his attention to his PDA or other matters." *Id.* at 3.

---

which are supported by citations to the record.

Plaintiff was not compliant with rules for scheduling and calling off work. *Id.* at 3. Plaintiff "was counseled, verbally and in writing, regarding the need for him to work his scheduled hours and following company policy with regard to schedule changes." *Id.* Plaintiff received several disciplinary actions for his failure to follow proper procedures concerning scheduling changes. Ex. 2 to Ex. C (doc. 23-2 at 12-13).

On December 10, 2010, Plaintiff called Meringolo and "said that if any employee was suspended or terminated he would leave the [Facility] and not return until the employees were called back to work." Ex. C. Meringolo told Plaintiff that his behavior "would be unprofessional" because employee discipline was not his concern. *Id.* Plaintiff told Meringolo, "Just do it and wait and see," and Plaintiff added that he would "show her." *Id.* at 3.

Also in December 2010, Plaintiff informed Meringolo that he was not going to sign off on the required Chronic Care[3] Initial Order Forms and would write his own orders. Ex. C at 3 (doc. 23-2). The Chronic Care Initial Order Forms provide a checklist to be followed from the initial intake through to healthcare provider evaluation. *Id.* "Depending on the nature of the condition, Corizon has in place protocols for the time frames in which such individuals must be seen by a healthcare professional or doctor, the processes that must be followed, the lab work that must be performed, etc." *Id.* "The protocols are put in place to conform to the National Commission on Correctional Health Care's ("NCCHC") Standards for Health Services in Jails and to

---

[3] Depending on the nature of the chronic condition, Corizon has protocols in place concerning the time frames in which inmates much be seen by a healthcare professional, the processes that must be followed, and lab work that must be performed. Ex. C.

ensure that Corizon maintains its accreditation and that the medical needs of the inmates are appropriately met." *Id.* at 3-4. Thus, Corizon uses the Chronic Care Initial Order Form and checklist. *Id.* at 4.

When an inmate is booked into the Facility, "Corizon intake staff obtains the initial information from the inmate regarding his or her medical conditions." *Id.* If the "inmate has a chronic health condition, the Chronic Care Initial Order Form is used." *Id.* Staff compete the form, sign and date it, and intake staff "identifies the labs to be ordered for the inmate, based on the inmate's condition and medical guidelines." *Id.* The form goes into the inmate's chart, and the Charge Nurse will "review the form to ensure that it has been completed accurately and signs-off on the proposed lab work to be conducted . . . ." *Id.* The doctor is then "required to review the chart, the Chronic Care Initial Order Form, and proposed labs." *Id.* "At that point, the doctor can modify the lab work requests or leave them as they are." *Id.* The doctor "must sign the Chronic Care Initial Order Form before the lab work can occur." *Id.*

Plaintiff told Meringolo that he did not like the Chronic Care Initial Order Form and wanted to change it. Ex. C (doc. 23-2 at 4). Meringolo told Plaintiff, "speaking as a colleague, professional and friend, he should not refuse to follow mandated corporate policies and that he would get in trouble." *Id.* Plaintiff replied that "he did not care and he hoped they would fire him so he could collect 'social security' and have time to complete his studies so he could take his exams." *Id.* Meringolo told Plaintiff he did not have "authority to change the process or form, but he could certainly propose changes to the Regional Medical Director." *Id.* at 4-5.

Furthermore, when Plaintiff told Dr. Kennedy that "he did not like the Chronic Care Initial Order Form and wanted to change it," Dr. Kennedy instructed Plaintiff "that he was required to use" the forms, but they would "discuss his concerns and suggested changes when [they] met on December 20, 2010." Ex. D (doc. 23-4 at 3). Dr. Kennedy advised Plaintiff "to leave the matter alone until then." *Id.* Dr. Kennedy further stated that "[t]he decision of whether [or] not to use the Chronic Care Initial Order Form was not a 'medical decision', it was an administrative requirement used to ensure that proper medical protocols were followed." *Id.* "Thus, [Plaintiff] did not have the authority to ignore the requirement." *Id.*

Dr. Kennedy was unaware of the fact that Plaintiff "had already taken matters into his own hands and told the Charge Nurse that the Chronic Care Initial Order Form guidelines and checklist were not to be followed" but Plaintiff's process was to be followed instead." *Id.* Although Plaintiff did not have permission to direct a change in protocol, on December 7, 2010, Plaintiff told "LPN Tamer Morghem" not to use the Chronic Care Initial Order Form which Morghem "converted into a written note of instruction that no labs, EKGs, or other tests were to be ordered until the doctor had seen the patient." Ex. C at 5 (doc. 23-3). As a result of "Morghem's actions, in direct contradiction of company policy, he was disciplined and placed on a two-day suspension." *Id.* "In his disciplinary meeting, Morghem acknowledged that his actions had been wrong and he apologized." *Id.*

Plaintiff submitted the affidavit of Tamer Morghem who stated that on December 7th, he was advised by Charge Nurse Willix that Plaintiff had directed him (Morghem) to "no longer order labs, by default, based on certain co morbidities" because of

redundancies in inmate patient assessment and diagnosis processes at the jail. Doc. 25 at 27. Morgham commented to Willix that such a change needed "to be cleared by" Meringolo and put "in writing due to the repeated, conflicting, and confusing changes being made with booking paperwork recently." *Id.* Willix said that Morghem could "continue ordering labs and filling out the paperwork if [he] wanted, but she would just discontinue the orders when the charts reached her." *Id.* Morghem made a note of it to pass on at shift change. On December 10th, Morghem was called to a meeting with Meringolo and Debbie Sellers, Director of Nursing, where Morghem was told that he had "violated policy taking an order from [his] Charge Nurse." *Id.* Meringolo said that the Doctor [Plaintiff] did not know what he was doing and because "shit rolls down hill," Morghem would be suspended for two days without pay. *Id.* Sellers said that "the Doctor [Plaintiff] doesn't have that authority to make changes and he thinks he is in private practice." *Id.* Meringolo added that "the Doctor doesn't realize that he's replaceable and that [Willix was] almost retired and doesn't really need her job." *Id.* Meringolo reported that Plaintiff had said "he's walking" if anyone faced disciplinary action and Meringolo said she did not "take idle threats kindly and would report him to corporate." *Id.* Morghem said in his affidavit that those words made it clear to him that Meringolo "had a pre-existing conflict with" Plaintiff. *Id.* at 27-28. Morghem said that Meringolo's "apparent conflict with [Plaintiff], for whatever reason, shouldn't have had anything to do with [Morghem] following an order by the charge nurse." *Id.* at 28. Morghem believes Meringolo put him in the middle of her conflict with Plaintiff. *Id.* Morghem said that Meringolo "is known at work for being hot-headed and argumentative, and [Morghem] felt she had her ulterior motives for suspending [him]

and there was no chance to debate it." *Id.* Morghem felt his suspension without pay was "too harsh and was her way of flexing her muscles to the Doctor [Plaintiff]." *Id.*

On December 16, 2010, Plaintiff entered Meringolo's "office in a huff" and was upset because he had been told that an employee had been suspended because of an order he gave. Ex. C at 5 (doc. 23-3). Meringolo asked Plaintiff where he got that information, and he refused to tell her. *Id.* Meringolo told Plaintiff it was not his business, and Plaintiff "became agitated and" told Meringolo "over and over that [she] did not have the authority to do this and that he was going to teach [her] a lesson." *Id.* Plaintiff then called Morghem and said that Meringolo "had no authority to suspend anyone" and "told Morghem to report to work immediately." *Id.* at 5-6. A short time later, Plaintiff again told Meringolo that she "had no authority to suspend anyone and that Morghem was going to work his shift." *Id.* at 6. When Meringolo learned that Morghem was at the Facility in the booking area, a confrontation ensued between Plaintiff and Meringolo, with Morghem caught in the middle between conflicting directions.[4] *Id.*

Meringolo asserts in her affidavit that she "spoke calmly and in a lowered voice" but Plaintiff "was very agitated." *Id.* Meringolo directed Morghem to clock out and leave because he was suspended, and she asked Plaintiff to "please lower his voice and stop acting out" and reminded Plaintiff there were security cameras in the hallway where they were speaking. *Id.* at 6-7. Plaintiff said he "did not care," and Meringolo "could have security come and escort him out of the building with Morghem." *Id.* at 7.

---

[4] Plaintiff was telling Morghem to stay and work his shift while challenging Meringolo's authority, and Meringolo was telling him to clock out and go home because he had been suspended for two days.

Plaintiff then threatened Meringolo "by stating, 'This is me pissed off, I will teach you a lesson, just wait, you'll see!' " *Id.*

Meringolo went to her office and called Regional Vice President Jane Lachner and told her about Plaintiff's behavior. *Id.* Meringolo also told Lachner that she thought she "smelled alcohol on him." *Id.* Plaintiff had "left the building for several hours that day and his eyes were incredibly blood shot." *Id.* Lachner directed Meringolo to have Plaintiff "clock out and go to the ER and have a blood alcohol test done." *Id.*

When Meringolo went to Plaintiff's office, she also found Morghem[5] there. *Id.* Meringolo once again directed Morghem to immediately leave, and "Morghem stood up and said, 'I'll be glad to clock out and continue this conversation in the parking lot.' " *Id.* Meringolo advised "there was no conversation to continue and" she would "have him escorted out by security." *Id.* Plaintiff was told "he also needed to clock out and have a blood alcohol test done at the ER per Dr. Kennedy and Jane Lachner." *Id.* Plaintiff followed Meringolo down the hall, yelling repeatedly that she "had no authority over anyone, especially him." *Id.* "During this entire event, [Plaintiff] kept repeating that he was the Medical Director and he was in charge and [Meringolo] had no authority." *Id.*

Meringolo returned to her office to find a message from Jane Lachner directing her to have Plaintiff call her. *Id.* at 7. When Meringolo gave Plaintiff the message, he

---

[5] Morghem's affidavit charges that Meringolo was the one screaming and upset and Plaintiff was the one who was calm. Doc. 26 at 28-29. Morghem also said that Meringolo's actions were "disrespectful, manipulative, unprofessional, disorderly in the face of the client, Leon County Jail, and embarrassing." *Id.* at 29. Morghem suggests that her request to have Plaintiff's blood drawn at the ER was a "manipulative request as damage control" because she was embarrassed about her behavior. *Id.* at 28. Morghem contends Meringolo falsely accused Plaintiff of being inebriated. *Id.* at 28-29.

said, "Why should I call Jane, she has no authority over me." *Id.* Meringolo asked

Plaintiff to call her out of courtesy; he asked for the number which Meringolo gave to

him. *Id.* at 7-8. Meringolo avers in her affidavit that she did not raise her voice or

become unprofessional during the entire event, but said that Plaintiff's "behavior was

very erratic and very threatening." *Id.*

Plaintiff called Jane Lachner and spoke with both Lachner and Dr. Kennedy. Ex.

C (doc. 23-3 at 8). Plaintiff was told "to clock out and go get a blood alcohol test[6]

done." *Id.* Plaintiff left the premises at approximately 6:30 p.m. *Id.*

Lachner said in her affidavit that Plaintiff "was disrespectful and unprofessional

during" the phone call and he insisted he "did not have to do what Ms. Meringolo said

because she was not his supervisor." Ex. E (doc. 23-5 at 3). Lachner states in her

affidavit that she had "repeatedly told" Plaintiff he did have to "report to Ms. Meringolo

regarding all administrative matters and that she was the highest ranking Corizon

employee in the Facility." *Id.* Lachner also said that because Plaintiff's demeanor

during the call was "entirely unacceptable" it led Dr. Kennedy and Lachner "to decide

that his employment should be terminated, regardless of the results of his alcohol test."

Ex. E (doc. 23-5 at 3-4).

On December 20, 2010, Dr. Kennedy met with Plaintiff at a restaurant and

Meringolo was present "as a witness." Ex. C (doc. 23-3 at 8). Dr. Kennedy informed

Plaintiff that he "was no longer employed with Corizon due to inappropriate, disruptive

and unprofessional behavior at the Facility on December 16, 2010." *Id.* Plaintiff "was

---

[6] It is undisputed that Plaintiff's test was negative for alcohol. Doc. 23 at 8; Ex. 2 to Ex. F (doc. 23-6 at 7); Doc. 26 at 11.

extremely agitated, repeating over and over that this was not possible." *Id.* Eventually, Plaintiff "took his personal effects from Dr. Kennedy" and, because Plaintiff said he had left his ID badge and keys at home, "Dr. Kennedy requested that he mail them to the facility." *Id.*

The decision to terminate Plaintiff's employment "was made by Dr. Kennedy and Jane Lachner." Ex. C (doc. 23-3 at 8). Dr. Kennedy said in his affidavit that the decision to terminate Plaintiff's employment "was based solely on his poor performance, unprofessional behavior, and insubordination on or about December 16, 2010, and was made in accordance with Corizon's policies." Ex. D (doc. 23-4 at 4). Lachner also states in her affidavit that her decision to terminate Plaintiff's employment was unrelated to Plaintiff's "race or national origin." Ex. E (doc. 23-5 at 4). Meringolo, Lachner, and Dr. Kennedy also state in their affidavits that Plaintiff "never complained about or reported any unlawful discrimination by anyone at Corizon during his employment." Ex. C (doc. 23-3 at 8); Ex. D (doc. 23-4 at 4); Ex. E (doc. 23-5 at 4). Meringolo said she never made any comments about Plaintiff's race and his race was not considered "when making any decisions related to his employment." Ex. C (doc. 23-3 at 8). Meringolo also said she "did not give any negative references to any prospective employer regarding" Plaintiff. *Id.* Neither Lachner nor Kennedy were aware of anyone giving a "bad reference" for Plaintiff to any prospective employee. Ex. E (ex. 23-5 at 4); Ex. D (doc. 23-4 at 4). Lachner explained that if "asked for a reference regarding a former employee, Corizon's policy is to only provide dates of employment, job title(s) and rate of pay." Ex. E (ex. 23-5 at 4).

On January 6, 2011, Plaintiff sent a letter to Corizon's President and CEO concerning Plaintiff's termination. Doc. 23 at 8; Ex. F. Plaintiff makes clear in the letter that he believes his termination was "unfair" but he never made any suggestion that the termination was due to discrimination or retaliation. *Id.* Plaintiff did not claim discrimination or retaliation until filing his Charge of Discrimination on or about January 12, 2011. Doc. 2-1 (Ex. A). After Plaintiff's termination, "Corizon hired an interim Medical Director to work at the Facility named Dr. Legros, who was also a black male from Haiti." Ex. E (ex. 23-5 at 4); Doc. 23 at 8.

Meringolo also stated in her affidavit that another employee, Ms. Charlene Reynolds, was fired because of poor job performance, inability to prioritize and perform her job responsibilities. Ex. C (ex. 23-3 at 8-9). Plaintiff was partially involved in that termination process because Plaintiff had "given a STAT order for a patient that she failed to complete in a timely manner." *Id.* at 9. Plaintiff never advised Meringolo that he objected to Reynolds' termination, and Meringolo stated that race was not considered "when making decisions related to her employment." *Id.*

**Analysis**

Title VII prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In a case such as this one, where there is no direct evidence of discrimination,[7] Plaintiff bears the burden of demonstrating a prima facie case of discrimination. Wilson v. B/E

---

[7] Although Plaintiff claims he has direct evidence of discrimination, doc. 26 at 13-15, he does not. There is no evidence of any statement which reveals a blatant discriminatory animus against Plaintiff.

Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004); Brown v. Alabama Dept. of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010). If Plaintiff makes the requisite showing, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, using the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the Defendant offers evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff who must then show "both that the reason was false, and that discrimination was the real reason." Springer v. Convergys Customer Mgmt. Grp., Inc., 509 F.3d 1344, 1349 (11th Cir. 2007).

In a case of wrongful termination, Plaintiff may establish a prima facie case of discrimination by showing (1) he is a member of a protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse employment action; and (4) he was replaced by someone outside the protected class. Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004). Defendant contends that Plaintiff is unable to establish a prima facie case of discrimination because Plaintiff has no evidence to show that he was similarly situated to persons outside his protected class who were treated better than he was. Doc. 23 at 14. Furthermore, Plaintiff has not shown that he was replaced by someone outside his protected class because Plaintiffs replacement was "also a black, Haitian, male, until a full time replacement could be found." Id. at 15. Defendant also contends that Plaintiff was not qualified to do the job because his job description required him to comply with company policies and procedures and maintain

a positive working relationship with the Facility's Health Services Administrator, Meringolo, and he did not do so. *Id.*

Plaintiff has not come forward with any evidence to show that he was subjected to discrimination. The only evidence Plaintiff submitted reveals there was a conflict between Plaintiff and Meringolo, and Plaintiff's unwillingness to accept Meringolo as a supervisor. Even Plaintiff's witness (Morghem) could not identify the "reason" for the conflict, even though he felt he had been placed in the middle of that conflict. However, having a conflict between employees is not unconstitutional. There is no evidence of a discriminatory bias, no evidence that Plaintiff was treated differently than other employees who were not black, and no evidence that Plaintiff was replaced by an employee outside of Plaintiff's protected class.

Moreover, even if Plaintiff had met the required initial showing, Plaintiff has not come forward with any evidence to show that Defendant did not have a legitimate reason for terminating Plaintiff's employment considering his refusal to acknowledge Meringolo acted as his supervisor in administrative matters such as which forms to use, following protocols, and how to properly make schedule changes, notwithstanding Plaintiff's failure to comply with Dr. Kennedy's instruction to Plaintiff to continue using the form. An inability to comply with protocols, for deliberately acting contrary to a supervisor's instructions, and causing disruptions in the work environment would be legitimate reasons to terminate an employee. Because Plaintiff has not provided any evidence to show the legitimate reason is merely a pretext for discrimination, the motion for summary judgment must be granted in Defendant's favor as to Plaintiff's discrimination claim.

Moreover, Plaintiff's retaliation claim must fail because there is no evidence which shows that Plaintiff was retaliated against because he engaged in protected activity.  "A prima facie case of retaliation contains three elements: first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the protected expression."  Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th Cir. 2002).  There is no evidence that Plaintiff engaged in protected conduct prior to his termination.  Thus, his termination is unrelated to the claim of retaliation.  The only potential basis for this claim is that after Plaintiff was terminated, and initiated his Charge of Discrimination, he suffered adverse action because of bad references.  However, there is no evidence that any person associated with the Defendant has given Plaintiff a bad reference.  Defendant's motion for summary judgment must be granted as to the retaliation claim as well.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's motion for summary judgment, doc. 23, be **GRANTED** on all remaining claims.

**IN CHAMBERS** at Tallahassee, Florida, on January 2, 2013.


 S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.